Mr. Cordova appeals the denial of his motion to suppress, wherein he argued that the hotel manager who opened the door to the hotel room where he was staying was acting on behalf of the government. Now, typically, a private person's actions do not implicate the Fourth Amendment, but the Supreme Court has taught us that they can when that person is acting as an instrument or agent of the government. And to determine whether that was the case, we look to all the circumstances of what happened. And the Supreme Court and other circuits, including this one, have looked to two primary factors. The first is the degree of the government participation in that private party's conduct. So passive conduct is insufficient. Simply receiving what an individual chose to get on his or her own behalf, that's not going to implicate the Fourth Amendment. But nor is compulsion required. So the government doesn't have to specifically ask for a particular search to happen. And that comes from Skinner v. Railway Labor Executives, a Supreme Court case, where the court found that a permissive regulation that allowed railway companies to get breath tests from employees still implicated the Fourth Amendment because it found in the context that the government actively encouraged, endorsed, and participated in those permissive searches. Can I ask you just a general question about our own precedent in our circuit? Because I see discussions in the briefing about a Ninth Circuit case called Miller. And I see a very recent decision from our case, from our court called Meals, where we say we haven't adopted a particular test. But my specific question is, we have a case called Bazan from 1986 that I think it cites Miller, but it seems to have a slightly more specific sort of set of considerations. So I guess I'm asking for help from counsel about what is our circuit precedent? What's the governing circuit precedent that we have to be ruled by in this case? Right. So in Bazan and also in more recent cases like Blocker, the court has recognized this Miller test, a two-factor test that looks to government knowledge and acquiescence and also the private party's motive. And the court acknowledged that in Bazan, which I believe was from 1987, two years before Skinner v. Railway Labor Executives. And at the end of the court's analysis in Bazan, the court says, here, you know, there was no compensation, no government initiation, and no government knowledge. Bazan talks about the government offering some form of compensation for the search, which is more specific than Miller, I think. Right. And nothing from the Supreme Court certainly indicates that compensation is required. You know, in Skinner v. Railway Labor Executives, the railway companies weren't paid in some way to do these tests, yet the Supreme Court still found that those permissive tests violated the Fourth Amendment. And so I think that Bazan is more correctly read as analyzing the factors in that case, saying he wasn't paid, government didn't know, government didn't initiate. Now, the court has in past cases sometimes repeated those three factors, but I don't think it's in a sort of litmus test type way of those requirements have to be met, and I don't know how that could be squared with Skinner v. Railway Labor Executives. Instead, the court has applied in several cases the two factors that the Ninth Circuit delineated, which are very similar to what the Supreme Court said, which is government participation and then the private party's motivation. Now, with regard to the private party's motivation, what the Fifth Circuit said, even before Skinner came out, was that a search done for purely private reasons is not going to implicate the Fourth Amendment, and Skinner also made reference to how in the context of that railway regulation, they couldn't find that the breath tests would be primarily a result of private initiative. And so in reading those cases, how I see it is you look at the degree of government participation, and maybe even when there is a lot of degree of government participation, if the person was purely doing it for private motives, then that might take it out of the Fourth Amendment ambit. And so if it's purely private motive, not implicating the Fourth Amendment, but when you have mixed motives, as I think there were here, then the Fourth Amendment can still be in play, depending again on all the circumstances of the case and the degree of that government participation. And so I wanted to just go over what the testimony at the suppression hearing established. The district court did find all four witnesses credible. There were three agents and the hotel manager, Mr. Patel, who opened the door. And so what the testimony established was that law enforcement received a tip that human smuggling might be occurring and implicating a particular room at the hotel. And so approximately ten law enforcement officers arrived at the hotel from three different entities, marked units, some in uniform, and two of the agents went to go speak with hotel management in the office. And they asked Mr. Patel about this particular room, made it clear they were interested in that room, and he gave them information about the people who had been renting that room and others, and asked if they wanted to get into the room. And the agent said, well, he asked if he could open the door, essentially. And the agent said, no, let me talk to my supervisor. And the agents left. And then Mr. Patel, who was still in his office, says that he saw the agents continuing to struggle, that they had been knocking on the door and weren't able to get in. And so then Mr. Patel walks across the parking lot toward the room, and before he gets to the room, he speaks with Agent Drake, who is the agent who is closest to the room. They're about 20 feet away from the door. And he asks Agent Drake if he wants in the room. And Agent Drake responds that they need a warrant, that the guests have a reasonable expectation of privacy in the room, and they need consent. Agent Drake testifies that he doesn't remember if he said consent from the hotel guests or consent from the owner. Mr. Patel credibly testifies that he was told that the warrant process was going to be long, and that the agents might still need to break the door. And he says he had the definite impression that the door was going to be broken, even with a warrant. And Mr. Patel also testifies that he tells the agents, before he opens the door, that he's going to open the door. Mr. Patel leaves this conversation with Agent Drake and walks past Agent Drake towards the door. Agent Drake testifies that he's surprised that Mr. Patel left in the middle of this conversation. He turns around and watches him, follows him. Agent Drake testifies he doesn't know in that moment, you know, if Mr. Patel is going to go knock on the door, if he's going to go open the door. But he continues to follow him at about a 10-foot distance and sees Mr. Patel take out his key and open the door. And Mr. Patel pushes the door open and then walks away. He does no sort of search a hotel manager might do if they're worried about, you know, property damage or whatnot. He just leaves the door. Is Mr. Patel the manager or the owner or both?  And so then the agents approach the door, see Mr. Cordova and others, question them, go into the room, search. Does the record reflect who rented the hotel room? Is it Mr. Cordova or someone else? It was someone else. It reflects that it was a woman. I don't recall if they say her name. The record doesn't reflect whether Mr. Patel specifically saw Mr. Cordova enter the room, just that he saw him after the door was open. I mean, the government may not be arguing anything about this, but is it settled that occupants of a hotel room who did not rent the room have a reasonable expectation of privacy? So, yes, he's a guest of the room, and there was an affidavit filed saying that he was told he could stay in the room as long as he could. He had clothing there. They had food and drink there. And the government never argued standing, and I think that's waived at this point because it wasn't argued below. With your recounting of the testimony, what is the greatest detail? You seem to be suggesting that Mr. Patel was perhaps motivated by his fear of property damage. If I don't open the door, it's going to get broken down, and then I've got to take care of this myself. How specific is the testimony that would suggest that he was motivated by that leverage as opposed to I'm going to open the door because I want this over with and I have a right to open the door? Right. So he testifies to many reasons why he opened the door. Several times he says it's to help the agents. He testifies at ROA 221. They told me that it's a long process for us to open the room and break the door, so I don't want them to break my door. Question. They gave you the impression they might have to break your door down. Answer, yes. Question. Okay, and that is why you wanted to open it, to help them. Answer, yes. He also says at some points that he opened the door because he was told it was going to be a long process. They quote, they just told me it's a long process for us and we have to break down the door, so I told them I will open the room for you and I open with my master key. That's ROA 222. Now, he does also just sort of generally say he wants to help the agents and also that he had been suspicious about what was going on in the hotel room. So he does mention those concerns and he says I don't know that anything is, I find it a little suspicious and I open the door. I wanted to know that anything illegal going on in my hotel. That's ROA 223. And then I think it was the prosecutor asked, was the concern about the illegal activity the reason why you opened the door? And he said, quote, no, I saw the officers were struggling and they just told me that it's a long process for us. So I told them I can open it for you. And so to me that's definitely mixed motive and there's maybe not even anything purely private motive coming in from what he's saying because it's all intertwined and dependent on the agents being there and giving him the impression that they're going to be there for a long time and that the door is going to be broken. Mr. Patel had his suspicions about these people in the room, but he never opened the door before. He rented a new room to them. He never called the law enforcement agents about this suspicion. And he didn't do any sort of search of his own after he opened the door. So in your view, what are your best cases that that show case or cases from our circuit or really any circuit that show that the facts under the facts here, Mr. Patel was acting as a government agent for purposes of the Fourth Amendment. So I think the best case is the Reed case from the Ninth Circuit. And that's in the briefing. It's another hotel case where the in that case, actually, the hotel employee did initiate the interest in getting into the room, but called law enforcement. And law enforcement was present and acted as a lookout as she essentially or maybe as a man rummaged through the room. And the Ninth Circuit reversed in that case and said, you know, this was not done for a purely hotel reason. It was done to look for the for evidence of the criminal activity. And that can't be an independent reason. So I think that is a helpful case. I also think just the distinguishing factors from this court's precedent where, you know, in my view, it's a much clearer, clearer cut case where there was not government participation in those cases. And so, you know, with that suppression motion, it was to exclude the evidence of him being found in the room, testimony that he was found there. And he asked broadly to suppress the identity evidence in the immigration file, which we know is also is foreclosed by this court's precedent. But that's what Mr. Cordova would be asking to suppress from this from his motion. More questions? Thank you. Thank you. Mr. Durbin. Hello again. Good morning. Please, the court. Richard Durbin for the United States. You started out with a question about what the, what the circuits, what the state of the circuit. What's our law? I don't, I don't think there's a, there's a clear statement of, of what the standard is. I think the clearest statement comes actually from Coolidge, a Supreme Court case which we cite. And basically Coolidge looks to, under all of the circumstances, did a private party act as an instrument or agent of the state or of the government? And then the courts, this court as well as Miller and the Ninth Circuit and so forth, the Seventh Circuit, have looked at various factors to flesh out, did the private party act as an instrument or as an agent? But it, it, it seems to me, and, and, and the ultimate question is, did the police or the law enforcement engage in conduct that violated the Fourth Amendment that warrants an application of the exclusionary rule? And I think if you start with that question and look at the facts of this case, my question is, what did the agents do that should be, that should be cause for suppression? And the, the testimony of the agents and Mr. Patel was, the agents responded to information that had been developing for several days of alien smuggling. And there was information that there were three aliens in a room at this OYO hotel in Alpine, Texas. And so they show up, they sort of split up. One group goes to room 115 where they have information these, these aliens are. And two other agents go to talk with, with the management of the motel or hotel. They end up talking first with somebody at the desk and then they talk to Mr. Patel. And Mr. Patel at some point during this says, I opened the door for you, which as I understand the agent's testimony, Agent Ferg, was a question of whether or not they wanted him to open the room. And, and, and according to Ferg's testimony, he said, no, I need to talk with a supervisor about that. And by his testimony, he never recalled going and talking to a supervisor about it. I don't think they ever got to that point because I think these events occurred fairly quickly. While that was going on, there's knocking on the door. Other agents are knocking on the door. They want to do a knock and talk and there is no answer. So they are in the parking area of this motel, hotel. It calls it a hotel, but to me it's a motel because it's parking spaces. And while the agents are sort of, I think, trying to figure out what the next step is, Mr. Patel comes and according to his testimony, he had decided before he left his office that he was going to open the door. That was what his testimony was. He comes up to the agents and he again, and the record is, I won't say it's confusing, but Mr. Patel says he told the agents that he was going to open the door. The agents testify that he did not tell them that he was going to open the door. They had no idea that that's what he was going to do. That there was talk about opening the door to which Agent Drake responded, telling him about, well, we need to get a warrant. A warrant's going to be sent. We need to get a warrant. The occupants have a reasonable expectation of privacy and it's going to be a relatively long process and we might have to break open the door when we get there. And that, in the record, is the first time that that's mentioned. And very abruptly, Patel turns, walks to the room, which is about, according to the testimony, 15, maybe 20 feet away, opens it with his master key, pushes the door open, has a sort of a shocked response or reaction to it, and turns and walks away. And then two agents walk to the door and look in and that's where they see Mr. Cordova. That's where they see him standing. Under those circumstances, and the district court found, the district court made some specific findings. It found that the agents did not directly participate in Mr. Patel's actions, that they did not know that he was going to do that and I don't think that's a clearly erroneous statement. The only thing the district court didn't do with respect to that was address Mr. Patel's statements that he said, yes, he was going to open the room. And I attribute that to misunderstanding of whether he was asking or telling because all of the agents who testified said they were not told that he was going to open the door. The agents did not ask him to open the room. In fact, they specifically at one point said no and they said what they were going to have to do to lawfully open the room. They didn't encourage him to open the door. There was no action in terms of that and that's the district court's determination and the agents did not acquiesce. There wasn't time to acquiesce in the first place and that's part of the standard that Miller talks about, knowledge and acquiescence, which I think that's a difficult sort of concept in this context because acquiescence really just means that it's a passive acceptance of something that you'd rather not. But that's not, it strikes me as that's not a Fourth Amendment type action on behalf of the police and that's really all there is is that the police didn't do anything when Mr. Patel turned and went to open the door and they didn't know what he was doing anyway. And so if the court should have suppressed the evidence that comes from opening that door, what is it that the police did wrong that the exclusionary rule needs to be used to address their misconduct or their improper conduct? And I submit on this record and based on the district court's findings there's nothing that the police did wrong. If you suppress the evidence it's almost capricious because what were they supposed to do? Not show up at the motel? Not show up in numbers at the motel? Not tell Mr. Patel what they were doing and what they had to go through to open the door? And the district court found there was no suggestion in that that the officers were trying to encourage or induce or intimidate or threaten him in some way to get him to take an action on their behalf. The agents have Mr. were they specifically looking for Mr. Cordova when they got to the motel or were they looking for illegal aliens? They were looking for three people who had been transported in a black terrain vehicle that had been seized by the local sheriff's office. And they were, they had I don't know in the record what the basis for their knowledge was but they got information from Border Patrol and so six Homeland Security investigator agents showed up and so did the sheriff of Brewster County and then eventually some Border Patrol agents showed up. As far as the mixed motives are concerned that's another one of those circumstances and I think opposing counsel correctly says if the only reason is that they wanted to play cop well that might be a problem. I'm not entirely sure what the relevance of the motives is though. Is it that it tends, if the motive is to help the police it makes it more likely that the police then were engaging the individual as an agent of theirs or they were somehow doing something that they shouldn't be. Most of these cases involve mixed motives. When you get to the mixed motives you basically come up with well it doesn't really seem to carry much weight. And the way I read the court's cases because this court in the cases that at least we've discussed and found they haven't found an improper search by police considering the factors and I read most of the cases saying well we're going to pay some lip service to Miller and it's not irrelevant but basically we're also looking at these other things which I think go to the ultimate question of did they, did the police somehow employ an individual as an agent or an instrument to do something to circumvent the Fourth Amendment or did they do something that they couldn't do themselves. And I think on this record there is nothing that supports a finding that the district court's conclusion was wrong and that there's a suggestion that these agents did something to circumvent the Fourth Amendment and there is no reason to suppress the evidence. It wouldn't accomplish the purpose and goal of the exclusionary rule. So with that I'd ask the court if there are no more questions I'll give you the rest of my time back to the court. Thank you. Thank you Mr. Durbin. Rebuttal. Thank you Your Honor. Yes. To address the conduct, the misconduct telling Mr. Patel that the door would be broken down even with a warrant that was incorrect and that provided the inducement for opening the door. You think the statement was incorrect that the door would be broken down? Mr. Patel had made it clear he could open the door with the key. They had a warrant. He can open the door with the key. There's no need to break down the door. And so that... And if they had gone and gotten a warrant there would have been no reason to break down the door? Correct. Right. And so that was incorrect and provided an incentive to avoid having the door broken down. They also did not explain that Mr. Patel could not consent to opening the door so they talk a lot. Agent Drake spoke a lot about reasonable expectation of privacy and the district court incorrectly found that Agent Drake said they needed consent from the occupants. The district court said that twice in his order. That is incorrect. Agent Drake testified at ROA, I think it's 266, that he didn't remember whether it was consent from the occupants or that manager but the district court relied on that and there was no inducement. The other thing that the agents didn't do which under these circumstances was necessary was to simply tell them to stop to not open the door. And they didn't do that in cases I believe Maxwell cited within Lamar in the brief was one of the court's cases where the wife said, oh you need to get the gun from the shotgun and the officer said, no we can't go in there, because the agents told her don't do that and she still did it. So just to understand your argument, what's the difference, what are the key differences in this case that distinguish it from that fact pattern you just told us about? Because the officers here did say, well we need to go get a warrant. Right? Right. They said we need to get the warrant but even with the warrant we're going to need to break down the door. And they explained that they couldn't open the door because the guests had a reasonable expectation of privacy from the government and never explained that Mr. Patel couldn't open the door for them. And so with the circumstances that were created here, the government essentially created a situation that Mr. Patel then responded to. I'm sure you said this, but the case with the shotgun, the woman, what case is that? It's from 1973. Okay. And Mr. Patel, I think opposing counsel may have been incorrect in that I don't recall anyone testifying at the suppression hearing that Mr. Patel did not tell them he was going to open the door. I don't think any of the agents were actually asked that question and the district court specifically finds that Mr. Patel's testimony that he told them he was going to open the door before he did was credible because it was not contradicted. And then the district court went into how Agent Drake couldn't recall some portions of his conversation with Mr. Patel. And the other thing, we discussed this some in the briefing, was whether should have known is enough. Did the agents know and if they knew, the district court did find that the agents didn't know. I think that's correct for Agent Ferg and for the third agent who testified. But for Agent Drake, what he testified was that he didn't know when Mr. Patel left the conversation what he was going to do. But then Agent Drake watched him walk to the door and use his key to open the door and very specifically described how he opened the door. So yes, it was quick. Sometimes Fourth Amendment violations happen quickly. But I think at least in that moment, Agent Drake knew what was going on and didn't do anything to stop it. It's Drake. When we go back and review the record, which of course we will, it's Agent Drake we should focus on. Yes, I think so because the interaction with Agent Ferg, we don't know how far removed in time that was from opening the door, but Agent Ferg had already left the office and was doing other things by the time the door was open. But I would just point out that this court's case is Mechgian. The court articulated the standard as whether the agents knew or should have known that I believe it was a nurse was rifling through her employee's documents to get them for her. And also in Clegg, the court recognized that unintentional deputization can be enough to implicate the Fourth Amendment. Well, thank you, counsel. Thank you for a well-presented argument. The case is under submission and the panel will take a 10-minute break before the next argument.